IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

———————

**DEVELOPERS SURETY & INDEMNITY CO.**,

   Plaintiff,

   v.                                                                   Civ. No. 11-32 BB/LFG

**HELCO, INC., BILLY HELLUMS, DOROTHY
HELLUMS, and JARED HELLUMS,**

   Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff's Motion for Summary Judgment (Doc. 17), Plaintiff's Motion to Dismiss Counterclaims (Doc. 16), and Defendants' Motion to Dismiss Complaint or Abstain Exercising Jurisdiction (Doc. 13). Having reviewed the submissions of the parties and the relevant law, the Court will decide these motions as discussed below.

## Summary of Relevant Facts

This matter arises from Plaintiff's efforts to obtain indemnification from Defendants pursuant to an Indemnity Agreement between the parties. In February of 2010, New Mexico State University ("NMSU") entered into a contract with FCI Constructors of New Mexico, LLC ("FCI") for the construction of the Campus Allied Health & University Transfer Center Project on NMSU's campus in Carlsbad, New Mexico (the "Project"). FCI, in turn, entered into a subcontract with Defendant Helco, Inc. ("Helco") in the amount of $403,746.00 for completion of concrete work and reinforcement on the Project. Plaintiff Developers Surety & Indemnity Co., as surety, issued a Subcontract Performance Bond (Doc. 1, Ex. C) and a Subcontract Payment Bond (Doc. 1, Ex. B), each in the amount of $403,746.00, in exchange for an Indemnity Agreement (Doc. 1, Ex. A). FCI is the obligee on both Bonds. Doc. 1, Ex. B; Doc. 1, Ex. C.

Defendant Helco is the principal and Defendants Billy Hellums, Dorothy Hellums, and Jared Hellums are indemnitors under the Indemnity Agreement. Doc. 1, Ex. A, p. 8.

On August 26, 2010, FCI gave Helco notice that it was in default on the Project and gave Helco until the morning of August 30 to cure. Doc. 1, ¶ 14. Four days later, FCI gave Plaintiff notice that it was defaulting Helco on the Project effective August 26, and made demand against both the Payment Bond and the Performance Bond. Doc. 17, Ex. 2. By the next day, Plaintiff's consultant, Tony Matz, had arrived in New Mexico to investigate FCI's claim of abandonment and mitigate Plaintiff's and Defendants' mutual exposure. Matz reviewed and analyzed the bids FCI had solicited from possible contractors to replace Helco on the Project. Doc. 17, Ex. 6. He also met with Billy Hellums to discuss potential contractors to replace Helco. *Id.*

On September 2, FCI terminated Helco based on §§ 16(b)(1), (3), (5), (7)-(10), and (12) of the subcontract. Doc. 17, Ex. 2; *see generally* Doc 27, p. 6. The termination letter further stated that "at the direction of [Plaintiff] no further payments will be made to [Helco]." Doc. 17, Ex. 2.

On September 3, FCI requested NMSU's approval to terminate Helco's subcontract and find a replacement subcontractor. Doc. 17, Ex. 3. NMSU conducted a hearing on the matter at which Helco was present and represented by counsel. In a written notice provided to Helco after the hearing, NMSU explained that it had reservations about FCI's claim that Helco abandoned the Project given that FCI ordered Defendant Helco off the Project. *See* Doc. 17, Ex. 4. Nonetheless, NMSU approved FCI's request to terminate Helco from the Project and to substitute another subcontractor in its place, explaining that NMSU "does have serious concerns about Helco's ability to perform work on [the] [P]roject." *Id.*

On October 8, FCI provided Plaintiff written notice of NMSU's decision and requested information from Plaintiff as to the actions it would take under the Performance Bond. Doc. 17, Ex. 5. Plaintiff informed Defendant Helco of NMSU's decision and its pending investigation to

find a replacement subcontractor.  Doc. 17, Ex. 9.  On October 18, Plaintiff and FCI entered into a Tender Agreement, which settled FCI's immediate claim against the Performance Bond, making Concrete Structures, Inc. ("Concrete") the replacement subcontractor and paying $347,033.81 to FCI – the difference between the cost for Concrete to do the entire subcontract work and the unpaid balance on Helco's subcontract.  Doc. 17, ¶ 22; *see also* Doc. 27, ¶ 13.  Later, two claims were made against the Payment Bond by suppliers to Helco (Southeast Redi-Mix Products, Inc. for $34,134.46 and CMC Construction Services for $11,174.86), which Plaintiff paid upon Helco's request and authorization.  Doc. 17, ¶¶ 24-28; Doc. 27, ¶ 14.

On November 24, Plaintiff demanded Helco pay a deposit of collateral of $450,000.00, but Helco did not do so.  Doc. 17, ¶¶ 30-31; *see generally* Doc. 27, p. 4.  Plaintiff then filed suit against Defendants in this Court on January 11, 2011 to recover the losses and expenses it incurred by reason of claims on the Bonds.  Doc. 1.  Plaintiff also sought a mandatory injunction requiring Defendants to deposit $450,000.00, the amount of reserves set by Plaintiff.  *Id.*  In response, Defendants alleged two counterclaims, one for breach of contract, and the other for breach of the covenant of good faith and fair dealing.  Doc. 12.

## Jurisdiction

The Court has jurisdiction over the suit pursuant to 42 U.S.C. § 1332 ("diversity jurisdiction").

## Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Medina v. Income Support Div.*, 413 F.3d 1131, 1133 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).  In response, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith*, 475 U.S.

574, 587-88 (1986).  To avoid summary judgment, the nonmoving party may not rest upon the mere allegations in the pleadings but must show, at a minimum, an inference of the existence of each essential element of the case.  *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Hulsey v. K-Mart, Inc*., 43 F.3d 555, 557 (10th Cir. 1994)).  When viewing the evidence, the Court must draw reasonable inferences in favor of the non-moving party.  *Matsushita*, 475 U.S. at 587.

## Discussion

### A. Plaintiff's Motion for Summary Judgment

Plaintiff moved for summary judgment against Defendants on Counts I (Breach of Contract and Indemnification) and II (Specific Performance) of the Complaint.  Plaintiff contends that summary judgment is appropriate based on the clear terms of the Indemnity Agreement and the undisputed evidence before the Court.

An indemnitee's right to recover from an indemnitor "necessarily turns upon the language of the indemnitor's undertaking."  *Bergerson Plumbing & Heating, Inc. v. Poole*, 807 P.2d 223, 225 (N.M. 1991).  In this case, there is an express Indemnity Agreement between the parties.  Doc. 1, Ex. A.  "Where there is such an express contract, a surety is entitled to stand upon the letter of his contract."  *Fidelity & Deposit Co. Of Maryland v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983) (quotations omitted).  Accordingly, the rights of the Plaintiff, as surety, are to be determined by the letter of the Indemnity Agreement.  *See Krieger v. Wilson Corp.*, 131 P.3d 661, 666 (N.M. App. 2005) (applying "the general rules of contract construction in determining the meaning of the language used in indemnity contracts and clauses").

Section 1 of the Indemnity Agreement requires each Defendant to indemnify Plaintiff for losses and expenses resulting from payment of claims against either the Performance or Payment Bond. This broad grant of indemnity states that each Defendant agrees to

> indemnify and hold harmless Surety from and against any and all liability, loss, claims, demands, costs, damages, attorneys' fees, and expenses of whatever kind or nature, together with interest thereon at the maximum rate allowed by the law, which Surety may sustain or incur by reason of or in consequence of the execution and delivery by Surety of any Bond on behalf of Principal . . . .

Doc. 1, Ex. A, §1. Clarifying this general indemnity provision, Section 1.2 provides Plaintiff with an express right to recover any costs associated with "Principal's nonperformance of an Obligation or any other matter covered by a Bond." *Id.* at § 1.2. Section 1.3 further provides Plaintiff with a right to all attorney's fees and expenses related to the adjustment or investigation of claims and losses. *Id.* at § 1.3. Submission of evidence of payments in the form of an itemized statement of expenses, declared under penalty of perjury to be true and correct, constitutes prima facie evidence of the fact and amount of liability. *Id.* at §2.4.

Section 3, in turn, permits Plaintiff to establish a reserve amount to cover any liability or claims asserted against the Bonds. *Id.* at §3. Defendants must "immediately upon demand" deposit with Plaintiff an amount equal to the reserve amount. *Id.* If Defendants fail to make such a deposit, Section 3 provides Plaintiff with the express right to seek a mandatory injunction to compel the deposit of such collateral. *Id.*

The undisputed evidence establishes that Plaintiff incurred costs of at least $45,309.32 to settle two claims against the Payment Bond, (Doc. 17, Ex. 11), and at least $347,033.81 to settle FCI's claim against the Performance Bond, (*id.*). Plaintiff also spent $12,690.63 investigating the claims against the Bonds, and a further $4,428.45 in legal fees in consequence of these claims. It is also undisputed that Plaintiff made demand for a deposit by Defendants of collateral in the amount of $450,000, the amount of the reserve set by Plaintiff as a result of the claims against the Payment and Performance Bonds. Doc. 1, ¶ 40; Doc. 12, ¶ 26. Pursuant to Sections 1

and 3 of the Indemnity Agreement, Plaintiff is entitled to indemnification from Defendants in the amount of $409,219.51 and a mandatory injunction requiring Defendants to deposit $450,000.00 in the reserve account. Plaintiff has thus made a prima facie argument entitling it to summary judgment on both Counts I and II of the complaint.

Nonetheless, Defendants oppose the Motion for Summary Judgment on four grounds: (1) Defendants contend that the Indemnity Agreement is ambiguous; (2) Defendants claim that they are not obligated to pay Plaintiff until it is determined that Helco breached its subcontract with FCI; (3) Defendants argue that Plaintiff failed to establish that it acted in good faith in paying $347,033.81 to settle FCI's claim against the Performance Bond; and (4) Defendants contend that Plaintiff has failed to establish damages. The Court will discuss each of these arguments in turn.

**1. Indemnity Agreement:** Defendants argue that the broad grant of indemnity in Section 1 is rendered ambiguous by the specific examples of liabilities, losses, costs and expenses listed in Section 1.2 of the Indemnity Agreement. "A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions." *Allsup's Convenience Stores, Inc. v. North Riv. Ins Co.*, 976 P.2d 1, 12 (N.M. 1998). In determining whether an ambiguity exists, the contract must be considered as a whole. *Atlas Assur. Co., Ltd. v. General Builders, Inc.*, 600 P.2d 850, 852 (N.M. App. 1979).

Review of the Indemnity Agreement reveals no conflict or ambiguity generated by Section 1.2. Section 1 expressly states that Defendants, as indemnitors, are generally liable for "any and all . . . expenses of whatever kind of nature . . . including, *without limitation*," those expenses listed in Sections 1.1 through 1.7. Doc. 1, Ex. A (emphasis added). Section 1.2 then provides Plaintiff with an express right to recover for liability incurred by "any or all claims, demands, costs, losses, suits, proceedings or judgments relating to Principal's nonperformance of an Obligation or any other matter covered by the Bond." In this light, Section 1.2 clarifies the general terms of the broad grant of indemnity in Section 1. Because Defendants have failed to

explain how Section 1.2 renders the Indemnity Agreement susceptible to more than one meaning or otherwise ambiguous, the Court concludes that Defendants' first contention is without merit.

**2. Liability Determination:** Defendants argue that they are not obligated to indemnify Plaintiff until Helco is deemed liable under its subcontract with FCI. This argument, however, runs contrary to the express terms of the Indemnity Agreement. As noted previously, Section 1 provides indemnification for any expenses suffered by Plaintiff "in consequence of the execution and delivery by Surety of any Bond on behalf of Principal . . . ." Doc. 1, Ex. A, §1. In other words, Plaintiff's payment on a Bond on behalf of Helco establishes liability. A judicial determination of Helco's default on its subcontract with FCI is not therefore a prerequisite to Plaintiff's right to recover expenses paid in execution of either of the Bonds.

This interpretation of the Indemnity Agreement finds support in decisions from other jurisdictions interpreting similar indemnity provisions. For example, in *Commercial Insurance Co. of Newark v. Pacific–Peru Construction Corp.*, the indemnity agreement provided the surety with a right to recovery for "all liability, losses, costs, damages, attorneys' . . . fees, . . . and expenses of whatever kind or nature which the Surety may sustain or incur by reason or in consequence of having executed . . . such bond . . . ." 558 F.2d 948, 953 (9th Cir. 1977). Pursuant to this contractual language, the Ninth Circuit held that the indemnitor was liable for the payment the surety actually made to discharge an obligation of the indemnitor under a foreign judgment. *Id.* It mattered not whether that foreign judgment was valid or otherwise enforceable in the United States. *Id.*. *Commercial Insurance* thus bolsters the conclusion that the Indemnity Agreement in this case provides Plaintiff with a right to recovery payments made in execution of any Bond on behalf of Helco, regardless of Helco's underlying liability on the subcontract.[1]

---

[1] Other jurisdictions interpreting similar indemnity agreements have held that the surety had the right to recover reimbursements for payments made, regardless of the principal's liability. *See Bristol Steel*, 722 F.2d at 1163 (under the letter of the contract, surety had the right to reimbursement for payments made in good faith, whether or not liability existed); *Fidelity and*

7

Nonetheless, Defendants cite *Bergerson Plumbing* for the proposition that a surety must establish liability prior to seeking indemnification from the indemnitor. 807 P.2d at 226. In that case, the indemnification agreement required the contractor, as indemnitor, to indemnify the surety for "nonconforming work performed by a subcontractor." *Id.* at 224. That is, "the subject of indemnification was nonconforming work." *Id.* at 226. Accordingly, the New Mexico Supreme Court held that "[w]hen the purpose of the agreement is to indemnify against loss or harm, damages as contemplated must be sustained and proved." *Id.* at 226. The court thus held that the surety was entitled to a trial on the merits to prove the subcontractor's nonconforming work and establish that the surety was entitled to indemnification under the agreement. *Id.*

*Bergerson Plumbing* is, however, distinguishable. In the instant case, the Indemnity Agreement does not limit Plaintiff's right to recover to nonconforming work or otherwise require a judicial determination of liability on the part of the indemnitor. To the contrary, the Indemnification Agreement clearly provides the Plaintiff, as surety, a right to recover for any payments made in execution of a Bond on behalf of Defendant Helco. Doc. 1, Ex. A, §1. Accordingly, Defendants' second argument in opposition to Plaintiff's Motion for Summary Judgment is without merit.

**3. Implied Covenant of Good Faith and Fair Dealing**: Defendants argue that summary judgment is not appropriate because Plaintiff failed to exercise good faith in paying $347,033.81

---

*Deposit Co.*, 722 F.2d at 1163 (holding that where an express indemnification agreement exists, a principal need not be liable for the debt in order for a right of indemnification to exist in favor of a surety); *U.S. Fidelity & Guar. Co. v. Feibus*, 15 F.Supp.2d 579, 583 (M.D. Pa. 1998) (rejecting indemnitors' arguments that there must be actual liability under the bonds before the surety may recover from the indemnitors); John W. Hinchey, *Surety's Performance Over Protest of Principal: Considerations and Risks*, 22 Tort & Ins. L.J. 133, 143 (Fall 1986) ("[G]eneral indemnity agreements typically permit the surety to perform or settle with an obligee and recover from the indemnitors, without regard to a judicial determination of default or, for that matter, where there has been a judicial determination that the principal is not in default.").

to settle FCI's claim against the Performance Bond.[2]  In response, Plaintiff contends that Section 2.1 grants it, as surety, "sole and absolute discretion to determine whether any claims under a Bond shall be paid, compromised, defended, prosecuted, or appealed."  Doc. 1, Ex. A, §2.1.  Plaintiff thus argues that its "sole and absolute discretion" to settle FCI's demand on the Performance Bond was not limited by a duty to act in good faith.  In the alternative, Plaintiff argues that Defendants have failed to produce competent evidence from which a finding of bad faith could be considered by this Court.

The Indemnity Agreement does not contain an express requirement of good faith and fair dealing.  Rather, it grants Plaintiff "sole and absolute discretion" to settle claims on either of the Bonds.  Doc. 1, Ex. A, §2.1.  Plaintiff thus urges us to follow those jurisdictions that have limited the surety's duty of good faith to those circumstances where the indemnity agreement itself imposes such a duty.  *See Associated Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 278 (Tex. 1998) (surety has no common-law duty of good faith under Texas law, but there was evidence to support finding that surety failed to satisfy contractual condition of good faith in indemnity agreement).  The Court is not persuaded for the following reasons.

To begin with, an implied covenant of good faith and fair dealing is consistent with New Mexico law.  *See Watson Truck & Supply Co. v. Males*, 801 P.2d 639, 642 (N.M. 1990) ("every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement."); *see also Sanders v. FedEx Ground Package System, Inc.*, 188 P.3d 1200 (N.M. 2008); Restatement (Second) of Contracts § 205 (1981).  Courts in jurisdictions that recognize the existence of an implied covenant of good faith and fair dealing in every contract have

---

[2] It is undisputed that Plaintiff made two payments to settle claims on the Payment Bond – $34,134.46 to Southeast Redi-Mix Products, Inc. and $17,119.08 to CMC Construction Services – with the express authorization of Defendant Helco.  Defendants do not assert that Plaintiff breached the implied covenant of good faith and fair dealing in settling these claims.  Rather, Defendants focus exclusively on Plaintiff's payment to settle FCI's claim against the Performance Bond.  *See generally*, Doc. 27, p. 11.

concluded that a surety owes a duty of good faith to its principal irrespective of whether the indemnity agreement expressly imposes that duty. *See, e.g.*, *The Hartford v. Tanner*, 910 P.2d 872, 879 (Kan. App. 1996) ("obligation of good faith and fair dealing on the part of the surety is implied and in a sense superimposed on the entire surety contract"); *City of Portland v. George D. Ward & Assocs., Inc.*, 750 P.2d 171, 174 (Or. App. 1988) (applying "implied obligation of good faith in . . . every contract" to indemnity agreement); *PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.*, 838 A.2d 135, 151 (Conn. 2004) ("Although the indemnity agreement at issue in the present case did not require, expressly, that [surety] act in good faith, the parties recognized, both at trial and at oral argument before this court, that the implied covenant of good faith is an overlay that applies to sureties."); *see also Associated Indemnity Corp.*, 964 S.W.2d at 282 ("[t]hose jurisdictions recognizing an affirmative duty of good faith in surety contracts have generally done so . . . because they impose such duty in all contracts").

Moreover, an implied duty of good faith is consistent with the reasonable expectation of the parties to an indemnity agreement. As the court explained in *City of Portland*,

> Parties to an indemnity agreement which subjects the right to compromise a claim against the principal to the sole discretion of the surety must reasonably expect that compromise and payment will be made only after reasonable investigation of the claims, counterclaims and defenses asserted in the underlying action.

750 P.2d at 175; *see also Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal.App.4th 464, 482 (Cal. App. 1996) (standard of good faith implied in every contract applies to surety's conduct; doctrine has "particular application in situations where one party is invested with a discretionary power affecting the rights of another").[3]

---

[3] An implied duty of good faith and fair dealing is particularly appropriate where an indemnification agreement provides the surety with absolute discretion to make payments on a bond prior to a judicial determination of the principal's liability. *See Gulf, Colorado & Santa Fe Railway Company v. McBride*, 322 S.W.2d 492, 495 (Tex.1958) ("Having settled the claim without obtaining a judicial determination of its liability, petitioner [surety] assumed the risk of being able to prove the facts which might have rendered it liable to the plaintiff as well as the

These rationales counsel in favor of imposing an implied covenant of good faith and fair dealing in the surety context. Thus, even though the Indemnity Agreement in the instant case grants Plaintiff sole discretion to settle any claims against a Bond, *see* Doc. 1, Ex. 1, §2.1, Plaintiff owed Defendants an implied duty of good faith and fair dealing in settling FCI's claim against the Performance Bond.

New Mexico has not, however, directly addressed what the covenant of good faith requires in the surety context. In *Watson Truck*, the New Mexico Supreme Court held that "[b]roadly stated, the covenant [of good faith] requires that neither party do anything which will deprive the other of the benefits of the agreement.'" 801 P.2d at 642. The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party. *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 82 (N.M 1993). It would thus appear that New Mexico requires the principal to establish something more than mere negligence on the part of a surety to prove bad faith, namely "improper motive" or "dishonest purpose." *PSE Consulting Inc.*, 838 A.2d at 151; *see also*, *Frontier Ins. Co. v. Int'l Inc.*, 124 F.Supp.2d 1211, 1214 (N.D. Ala. 2000) ("In the suretyship context, lack of good faith carries an implication of a dishonest purpose, a conscious doing of wrong, a breach of a duty through motives of self-interest or ill will.") (quotations omitted); *Engbrock v. Federal Ins. Co.*, 370 F.2d 784, 787 (5th Cir. 1967) ("[N]either lack of diligence nor negligence is the equivalent of bad faith . . . and improper motive . . . is an essential element of bad faith.").

Some jurisdictions, however, hold sureties to a less forgiving standard of good faith. For example, in *Rush Presbyterian St. Luke's Medical Center v. Safeco Ins. Co. of America*, the court

---

reasonableness of the amount which it paid. It will be necessary, therefore, for petitioner to establish that from its standpoint the settlement was made in good faith and was reasonable and prudent under the circumstances.") (quotations omitted).

reasoned that "negligence and bad faith are synonymous" in the context of determining good faith.  712 F.Supp. 1344, 1346 (N.D. Ill.1989).  Other courts have similarly defined bad faith as unreasonable conduct on the part of the surety.  *See, e.g.*, *Arntz Contracting Co.*, 47 Cal.App.4th at 483 (surety's bad faith can be demonstrated by proof of "objectively unreasonable conduct, regardless of the actor's motive") (quotations omitted); *City of Portland*, 750 P.2d at 175.

      The court need not decide what the implied covenant of good faith and fair dealing requires in the surety context, and declines to do so as this issue is properly left to the state courts.  Restraint is appropriate because, under either standard, Defendants have failed to raise a genuine issue of material fact that Plaintiff acted in bad faith in settling FCI's claim on the Bond.  To begin with, there is no evidence that Plaintiff acted with "improper motive" or "dishonest purpose."  *PSE Consulting Inc.*, 838 A.2d at 304.  Defendants imply that Plaintiff acted in bad faith by directing FCI to make no further payments to Helco within two days of beginning its investigation in New Mexico.  Plaintiff was, however, squarely within its contractual rights when it directed FCI to stop making payments to Helco.  FCI's written notice on August 30 declaring Helco in default constituted a default event under the Indemnity Agreement.  Doc.1, Ex. A, § 5.1 (defining a default as "any declaration by any obligee of an Obligation that Principal is in default thereunder").  Accordingly, any and all sums due were assigned to Plaintiff pursuant to Section 7.3.  It would thus be improper to infer that Plaintiff acted with dishonest purpose by simply exercising its rights under the Indemnity Agreement.  *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F.supp. 773, 777-78 (S.D. N.Y. 1969); *Horn v. Provident Life & Acc. Ins. Co.*, 351 F.Supp.2d 954, 963 (N.D. Cal. 2004).

      Defendants also allege that Plaintiff acted in bad faith by settling FCI's claim against the Performance Bond despite knowing that Helco had not breached the underlying subcontract.  In support of this contention, Defendants offer the Affidavit of Billy Hellums alleging that Plaintiff's consultant, Tony Matz, said he did not believe the work performed by Helco was

deficient in any way. Doc. 27, Ex. A, ¶17. Defendants thus appear to suggest that FCI acted with improper motive.

The threshold question then is whether Matz's extrajudicial statements are admissible evidence. Rule 801(d)(2)(D) of the Federal Rules of Evidence provides that a statement is not hearsay if it is "offered against a party and is . . . a statement by the party's agent . . . concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). Among other things, the proponent of the evidence has the burden of demonstrating that an individual qualifies as an "agent." *Daniel v. Ben E. Keith Co.*, 97 F.3d 1329, 1335-36 (10th Cir. 1996). Here, however, Defendants' affidavit does not contain sufficient information to demonstrate whether Matz should be considered an agent of Plaintiff or simply an independent contractor. *See Contracts Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 164 F.Supp.2d 520, 530 (D. Md. 2001) (explaining that proponent failed to establish whether individuals "were 'agents' of defendants as opposed to independent contractors"). It would appear that Matz was an employee of Sage Associates, Inc. Doc. 17, Ex. 6. Thus, the mere fact that Matz investigated FCI's claim against the Performance Bond is insufficient to establish an agency relationship between Matz and Plaintiff. *See U.S. ex rel. Burlbaw v. Orenduff*, 400 F.Supp.2d 1276, 1278-79 (D. N.M. 2005). Defendants have thus failed to establish an agency relationship between Plaintiff and Matz, let alone that Matz's extrajudicial statements fit the remaining requirements of Rule 801(d)(2)(D). Accordingly, the Court will not consider Matz's extrajudicial statement in ruling on Plaintiff's motion for summary judgment. *See Thomas v. Int'l Business Machines*, 48 F.3d 478, 485 (10th Cir. 1995) ("[H]earsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment because [a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill.") (quotations omitted). As a result, Defendants' contention

that Plaintiff acted in bad faith by settling FCI's claims against the Performance Bond despite knowing that Helco's work was not deficient in any way fails for a lack of evidentiary support.

Even under a more stringent standard, namely one that equates bad faith with negligence, Defendants have failed to raise a genuine issue of material fact.  In *City of Portland*, the court held that the indemnitors "needed only to prove that [the surety] failed to make a reasonable investigation of the validity of the claims against them or to consider reasonably the viability of their counterclaims and defenses, not that [the surety] acted for dishonest purposes or improper motives."  750 P.2d at 175.  Applying similar reasoning, the court in *The Hartford* found that the surety had acted unreasonably and in bad faith given the evidence that it "simply paid the claims and sought indemnification."  910 P.2d at 881.  This is not, however, a case where the surety failed to investigate the claims against the principal.  Upon receiving FCI's claim that Helco abandoned the Project, Plaintiff immediately sent an investigator, Tony Matz, to New Mexico.  Doc. 17, Ex. 6.  Matz met with both FCI and Defendant Billy Hellum, reviewed FCI's claim of abandonment, and discussed potential substitute contractors.  *Id.*  Plaintiff also benefitted from NMSU's investigation into the matter, findings of fact, and approval of FCI's request to terminate Helco.  Doc. 17, Ex. 4.[4]  The evidence thus fails to demonstrate an unreasonable investigation on the part of Plaintiff.

Defendants also argue that Plaintiff failed to keep Defendants fully informed until well after the fact, and only after Plaintiff settled FCI's claim against the Payment Bond.  Defendants thus appear to argue that the lack of notice was unreasonable and rose to the level of bad faith.  This argument overlooks the express terms of the Indemnity Agreement.  Section 10 provides

---

[4] Defendants allege that Plaintiff breached the covenant of good faith and fair dealing by failing to ensure that NMSU was authorized to substitute Helco pursuant to the Subcontractors Fair Practices Act.  Resolving this issue is not, however, a prerequisite to surety's right to recover under the Indemnity Agreement.  Accordingly, Defendants' claim that NMSU improperly substituted Helco relates to its state law claims against NMSU and FCI, not the current issue before this Court.  *See infra* § C (discussing Defendants' state law claims).

14

that the surety must "make a reasonable effort to give Principal and Indemnitors notice of any material information about which Surety has knowledge . . . ." Doc. 1, Ex. 1, §10. Accordingly, Plaintiff kept Defendants informed of its investigation into FCI's claim of abandonment via both e-mail and face-to-face meetings. Doc. 17, Ex. 6. Plaintiff was not, however, required to provide Defendants with notice prior to making any payment decisions or entering into a Tender Agreement with FCI. *See Feibus*, 15 F.Supp.2d at 586-87; *United States for the Use of Int'l Brotherhood of Electrical Workers v. United Pacific Ins. Co.*, 697 F.Supp. 378, 381 (D. Idaho 1988). Thus, even assuming Plaintiff did not inform Defendants of the Tender Agreement with FCI until after the fact, that would not rise to the level of unreasonable conduct or bad faith. *Arntz Contracting Co.*, 47 Cal.App. 4th at 486 ("It is certainly true that indemnification is not precluded just because a surety is motivated to settle a case 'for its own benefit.'") (quoting *U.S. Fidelity Co. v. Sandoval*, 223 U.S. 227, 232 (1912)). Consequently, Defendants' assertion of lack of notice does not raise a genuine issue of unreasonable conduct or bad faith.

Finally, Defendants claim that Plaintiff paid an excessive amount to substitute Helco on the subcontract. Defendants do not, however, present any evidence supporting this allegation, let alone demonstrate that Plaintiff was negligent. In contrast, the uncontested evidence submitted to the Court demonstrates that FCI solicited bids on a replacement contractor. Doc. 17, Ex. 6. The bids ranged in price from $640,000 to $800,000, with the highest bid from Southwest Concrete Construction. *Id.* All of the bids were shared with Helco. *Id.* FCI then hired CSI to complete the contract because it was the only constructor to submit a viable quote. *Id.* In this light, Defendants' allegation that Plaintiff overpaid FCI to hire a subcontractor fails to raise a genuine issue of material fact regarding Plaintiff's conduct. Defendants' third argument against summary judgment is thus without merit.

    **4. Establishing Damages:** Lastly, Defendants argue that Plaintiff must establish its damages prior to seeking summary judgment. Section 2.4 of the Indemnity Agreement states that

an "itemized statement of claims or losses . . ., declared under penalty of perjury to be true and correct . . . shall be prima facie evidence of the fact and extent of liability hereunder of Principal and Indemnitor."  Doc. 1, Ex. 1, §2.4.  Plaintiff submitted the signed declaration of Susan Moore establishing that Plaintiff paid $347,033.81 to settle FCI's claims against the Performance Bond, $34,134.46 to settle Redi-Mix Product's claim against the Payment Bond, and $11,174.86 to settle CMC Construction Services' claim against the Payment Bond.  Doc. 17, Ex. 11.  Moore also attested to the following expenses paid as a result of claims against the Bonds: $12,690.63 to hire Sage Associates and Tony Matz to investigate FCI's claim of abandonment and $4,428.45 to hire legal counsel to issue the Payment Bond and Performance Bond for Helco.  *Id.*  Defendants have not submitted any evidence to contest the amount of damages established by Moore's affidavit.  Defendants merely allege that they had no prior notice of the expenses incurred by Plaintiff to hire an investigator and legal counsel.  Doc. 27, ¶15.  This argument, however, has no bearing on whether Plaintiff established damages pursuant to the Indemnity Agreement.  *See* Doc. 1, Ex. 1, §2.4.  Accordingly, the Court finds that there is no genuine issue of material fact regarding the amount of damages due Plaintiff.

     **5. Resolution of Plaintiff's Motion for Summary Judgment**: Defendants in the present case have failed to create a genuine issue of material fact for trial.  In the absence of contravening evidence from the Defendants, Plaintiff's submission of a sworn declaration demonstrating payments and expenses incurred in execution of claims on the Bonds, is sufficient to prevail on a motion for summary judgment. Accordingly, the Court will grant Plaintiff's motion for summary judgment on Plaintiff's first claim for reimbursement of losses and expenses in the amount of $409,219.51.  The Court will also grant Plaintiff's motion for summary judgment on Plaintiff's second claim for reserves in the amount of $450,000.00.

**B. Motion to Dismiss Counterclaims**

Plaintiff moved to dismiss Defendants' counterclaims alleging Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing. Doc. 16. The Court will grant this motion for many of the reasons identified in the above ruling granting Plaintiff's motion for summary judgment. *See supra* § A.

Defendants allege that Plaintiff breached the Indemnity Agreement by interfering with Defendants' performance on the subcontract with FCI. Doc. 12, ¶8.[5] Specifically, Defendants argue that Plaintiff was required to establish Helco's nonperforming work prior to seeking indemnification. Doc. 28, pp. 2-3. Failure to do so, Defendants claim, constituted a breach of the contract. As noted previously though, Section 1 of the Indemnity Agreement grants surety the right to recover expenses paid in consequence of claims or losses on a Bond regardless of the principal's liability. Doc. 1, Ex. A, §1. Under similar indemnity agreements, courts have routinely determined that a judicial determination of a principal's liability or failure to perform is not a prerequisite to the surety's right to seek reimbursement. *See Frontier Ins. Co.*, 124 F.Supp.2d at 1215; *Feibus*, 15 F.Supp.2d at 583; *General Acc. Ins. Co. of America v. Merritt-Meridian Const. Corp.*, 975 F.Supp. 511, 516 (S.D.N.Y. 1997). Accordingly, Plaintiff did not breach the contract by seeking indemnification prior to a judicial determination that Helco failed to perform the subcontract. The Court thus grants Plaintiff's motion to dismiss Defendants' first counterclaim.

Defendants also alleged breach of the implied covenant of good faith and fair dealing in their counterclaim. Doc. 12, ¶ 14. Defendants argue that Plaintiff (1) failed to keep Helco fully informed, (2) failed to adequately investigate whether Helco breached the subcontract, (3) failed

---

[5] Defendants' counterclaim for breach of contract further alleges that FCI had no basis for defaulting Helco; that NMSU similarly had no authority to substitute Helco; and that Helco was ready to perform at all times. Doc. 12, ¶¶ 3-5. None of these allegations are directed at Plaintiff and thus are not addressed by this Court.

to ensure that NMSU was authorized to substitute Helco, and (4) agreed to pay FCI excessive amounts to substitute Helco. The Court considered but rejected all of these arguments in granting Plaintiff's motion for summary judgment. *See supra* § A.3. Accordingly, for the same reasons, the Court grants Plaintiff's motion to dismiss Defendants' second counterclaim.

### C. Motion to Dismiss or, In the Alternative, Abstain Exercising Jurisdiction

Defendants filed a Motion to Dismiss requesting that this Court either dismiss the complaint or, in the alternative, abstain exercising jurisdiction by staying Plaintiff's claims pending establishment of any obligations by Defendants to Plaintiff in the Chaves County District Court proceeding. Doc. 13. Defendants contend that it is the essence of a surety's contract that there be a valid obligation owed by the principal. Accordingly, Defendants request that the Court abstain from exercising jurisdiction pending resolution of Defendants' claims in the Fifth Judicial District Court in Chaves County. Abstention, Defendants claim, would avoid piecemeal litigation and conserve scarce judicial resources. *See Colorado River Water Consv. Dist. v. United States*, 424 U.S. 800 (1976).

To begin with, Plaintiff has already established a valid obligation owed by Defendants – namely the $409,219.51 in costs and expenses incurred by reason of FCI's claims on the Performance Bond. Moreover, under the express terms of the Indemnity Agreement, a judicial determination of Helco's liability is not a prerequisite to Plaintiff's right to recover. Doc. 1, Ex. A, §1. Thus, the instant case does not turn on whether Defendants succeed on their state court claims that Helco was wrongfully terminated by FCI and wrongfully substituted by NMSU.[6] Indeed, the issues before this Court are distinct from Defendants' claims in state court, making

---

[6] If the Fifth Judicial District deems NMSU or FCI liable for improperly substituting or terminating Helco, Defendants would be able to recover damages from those parties incurred by Plaintiff's settlement of claims against the Bonds.

abstention inappropriate.  Accordingly, the Court denies Defendant's Motion to dismiss or, in the alternative, abstain from exercising jurisdiction.

## Conclusion

Pursuant to the foregoing, Plaintiff's motion for summary judgment (Doc. 17) will be granted; Plaintiff's motion to dismiss counterclaims (Doc. 16) will be granted; and Defendant's motion to dismiss or, in the alternative, abstain from exercising jurisdiction (Doc. 13) will be denied.  As a result, the case will be dismissed.

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE